Dissenting opinion by Associate Judge Easterly at page 29
Okun, Associate Judge, Superior Court of the District of Columbia:
*22 In this case, the police went to an apartment building at approximately 5 a.m. after receiving a radio run for an assault in progress. When the police arrived at the apartment building, they were met by a resident who told the police that he had called 911 because he heard yelling and screaming coming from an apartment on the second floor. The police went to the second floor of the apartment building and heard yelling and screaming coming from an apartment on that floor, which sounded like a distressed female yelling as if she were in pain or struggling. The police knocked on the door and approximately one to three minutes later, a woman who looked panicked and concerned answered the door. The woman opened the door halfway, but did not respond to the police officer's questions about what was happening inside the apartment. The woman then looked back inside the apartment and opened the door, after which the police entered the apartment.
The trial judge found that exigent circumstances justified the police officers' entry into the apartment without a warrant, and denied appellant's motion to suppress the evidence they seized after entering the apartment. Although the issue is a close one, we agree that exigent circumstances justified the warrantless entry into the apartment and the subsequent seizure of evidence. Accordingly, for the reasons set forth more fully below, we affirm.
I.
Viewed in the light most favorable to the trial court's ruling,[1] the government's evidence at the suppression hearing showed the following. On October 26, 2013, at approximately 5 a.m., the police received a radio run for an assault in progress at 1626 28th Street, SE, Apartment 3. Officers Jeremy Kniseley and Domonick Davis responded to that location, where they were met at the front door of the building by a resident who told the police that he had called 911 because he heard yelling and screaming coming from Apartment 3 on the second floor of the building.[2] The police went to Apartment 3 and knocked on the door, but as they were knocking on the door of Apartment 3, they heard yelling and screaming coming from Apartment 4. More specifically, Officer Kniseley testified that he heard a "distressed female" "yelling as if she was in pain or struggling" and Officer Davis testified that he heard a *23 lot of "commotion and going on" inside the apartment. In addition, the 911 caller, who had followed the police halfway up the steps to the second floor landing, pointed to Apartment 4 as the officers heard yelling and screaming coming from that apartment.
Officer Kniseley then knocked several times on the front door of Apartment 4, identified himself as a police officer, and requested that the occupants open the door. After a period of one to three minutes had elapsed, a woman opened the front door halfway. According to Officer Kniseley, this woman was partially dressed and appeared "somewhat panicked and concerned," while Officer Davis testified that the woman was wearing a shirt and looked "more like in a daze." The officers asked the woman what was happening inside the apartment, but the woman did not respond and instead looked back into the apartment and then fully opened the door.
After the woman fully opened the door, the officers observed another woman inside the apartment, who appeared to be in the process of getting dressed. Officer Kniseley testified that he thought "some sort of sexual assault" had been occurring inside the apartment, based on the "yelling and screaming, and what [he] thought was distress," and based on his observations of the two partially dressed women inside the apartment.
After observing these two women and not receiving any responses to their questions, the officers entered the apartment and observed appellant, with his body partially obscured behind a wall.[3] The police requested that appellant show his hands, but appellant refused to do so, and instead kept looking back towards the couch in the living room and then began reaching towards the couch. After the officers observed appellant reach towards the couch, Officer Davis wrestled appellant to the ground and both officers were able to handcuff him after a struggle that lasted one to two minutes. During the struggle, appellant repeatedly yelled "This is my house. I live here. This is my house." The couch in the living room moved from the wall as the result of this struggle, and when the officers stood up after handcuffing appellant, they observed a black handgun lying behind the couch. Officer Kniseley then recovered the gun, which the officer believed was loaded because it was "weighted" and "heavy."
After recovering the handgun, the police conducted a search of the remainder of the apartment to ensure their safety and the safety of the occupants. During this search, the police recovered one bag of marijuana from the top of a refrigerator, one bag of marijuana from a television stand in the living room, and a grinder with traces of marijuana on top of the couch. Appellant subsequently was charged with unlawful possession of a firearm, *24 in violation of D.C. Code § 22-4503 (a)(1) (2012 Repl.), possession of an unregistered firearm, in violation of D.C. Code § 7-2502.01 (a) (2012 Repl.), unlawful possession of ammunition, in violation of D.C. Code § 7-2506.01 (a), unlawful possession of a controlled substance (marijuana), in violation of D.C. Code § 48-904.01 (d) (2012 Repl.), and unlawful possession of drug paraphernalia, in violation of D.C. Code § 48-1103 (a).
Appellant filed a motion to suppress the evidence seized from his apartment, arguing that the evidence should be suppressed because the police entered his apartment without a warrant and without his consent. The government filed an opposition in which it argued that the police did not need a warrant to enter appellant's apartment because: (1) they were responding to an emergency situation in which they reasonably believed that the occupants in the apartment needed their assistance; and (2) the woman who answered the door had consented to the search. The trial court conducted a hearing on appellant's motion to suppress the evidence seized from his apartment, at which both Officers Kniseley and Davis testified. At the conclusion of the hearing, the trial court denied appellant's motion, stating that she credited the testimony of the officers and finding that exigent circumstances justified the officers' warrantless entry into appellant's apartment and subsequent seizure of evidence.[4]
At appellant's first trial, the jury acquitted appellant of unlawful possession of drug paraphernalia and could not reach a unanimous verdict as to the other charges. The government subsequently dismissed the unlawful possession of marijuana charge prior to appellant's second trial. At the second trial, the jury convicted appellant of all three gun charges, and this appeal followed.
II.
Appellant argues on appeal that the trial court erred in denying his motion to suppress evidence because there were no exigent circumstances justifying a warrantless search, and because appellant did not consent to a search of the apartment. We need not address appellant's consent argument, because we find that exigent circumstances justified the warrantless search. See, e.g., Oliver v. United States , 656 A.2d 1159, 1164 n.11 (D.C. 1995) (not addressing consent argument after finding that search was justified under exigent circumstances doctrine).[5]
The Fourth Amendment of the U.S. Constitution "permits an officer to enter a dwelling without a warrant if the officer has 'an objectively reasonable basis for believing' that entry is necessary 'to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.' " Evans v. United States , 122 A.3d 876, 881 (D.C. 2015) (quoting Brigham City, Utah v. Stuart , 547 U.S. 398, 403, 406, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006) ). This exception to the warrant requirement, known as the "emergency aid exception," does not depend on "the seriousness of any crime [the officers] are investigating when the emergency arises," and instead "requires only 'an objectively reasonable basis for believing' that 'a person within [the dwelling] is in need of *25 immediate aid.' " Michigan v. Fisher , 558 U.S. 45, 48, 130 S.Ct. 546, 175 L.Ed.2d 410 (2009) (quoting Brigham City , 547 U.S. at 404-05, 126 S.Ct. 1943 ; Mincey v. Arizona , 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (internal citations omitted) ); see also Fisher , 558 U.S. at 49, 130 S.Ct. 546 (the police do not need "ironclad proof of a likely serious, life-threatening injury" to invoke the emergency aid exception).[6] Furthermore, police officers do not have to observe evidence of injuries before entering a premises pursuant to the emergency aid exception, because "[t]he role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties." Id. Finally, in evaluating the reasonableness of the police officers' actions, "the circumstances before [the officers] are not to be dissected and viewed singly; rather they must be considered as a whole. The totality of the circumstances-the whole picture-must be taken into account." Oliver , 656 A.2d at 1166 (quotations omitted).
For the following reasons, the officers in this case had an objectively reasonable basis for believing that they needed to enter appellant's apartment in order to provide emergency assistance to the occupants of that apartment. First, the officers received a call for an assault "in progress"
*26 at appellant's apartment building, so there was reason for the officers to believe that they were responding to a situation involving ongoing physical violence. Second, the information in the call was corroborated when the officers arrived at the apartment building and were met by the person who called 911 and told them he had called 911 because he heard yelling and screaming coming from an apartment on the second floor, and the 911 caller's reliability was enhanced by the fact that he did not remain anonymous but met the police at the apartment building. See, e.g., United States v. Jenkins, 329 F.3d 579, 581 (7th Cir. 2003) (911 call for assault in progress, when made by caller who identifies himself, can justify warrantless search under exigent circumstances exception); cf. Joseph v. United States , 926 A.2d 1156, 1161-62 (D.C. 2007) (upholding investigative stop and frisk based on 911 call from identified citizen, noting that "information from an identified citizen is presumptively reliable"). Third, this information was further corroborated when the officers went to the second floor and heard yelling coming from appellant's apartment, including the sounds of a woman who sounded as if she were yelling in pain. Fourth, when the officers knocked on the door of appellant's apartment, no one answered the door for a period of one to three minutes, and when a woman finally did answer the door, she appeared to be panicked and concerned. Fifth, the woman who answered the door did not respond to the police officer's questions about what was happening inside the apartment, and instead opened the door before the officers entered the apartment. Under these circumstances, it was objectively reasonable for the police to believe that their assistance was needed to prevent injury, or further injury, to the occupants of appellant's apartment.
The cases cited by appellant do not dictate a different result. Indeed, these cases involved situations where the police did not have an objectively reasonable basis to believe there was an ongoing emergency in the premises they entered without a warrant. For example, in Evans , supra , the police entered an apartment without a warrant even though they had no objectively reasonable basis to believe that anyone in the apartment needed emergency aid, because the two participants in an alleged domestic violence incident both were being interviewed in a parking lot outside the apartment building at the time of entry, and because each person described a physical altercation that only involved the two of them. 122 A.3d at 881-82.
Likewise, in Washington v. United States , 585 A.2d 167 (D.C. 1991), the police received a radio call for a woman with a gun, went to an apartment where the woman who answered the front door of the apartment told the police that her sister had a gun and she wanted it out of the house, and the officers then proceeded down a hallway to a room that was identified as the appellant's room. Id. at 168. The officers knocked on the door and asked the occupant to come outside and, after receiving no reply and waiting a few seconds, the officers forced the door open, breaking it off its hinges, and observed the appellant sitting peacefully on a bed with her three-year-old son. Id. at 168, 170. The police asked the appellant if she had a gun, and when she denied having one, the police removed the appellant's son from the room and searched the room, eventually finding a gun in a closed shopping bag on a shelf of the clothes closet. Id. at 168. This court, in a 2-1 opinion, reversed the trial court's denial of the appellant's suppression motion, finding that there were no exigent circumstances that justified a warrantless search of the room because the appellant was sitting "peacefully on a bed. Her *27 hands were in plain view; [and] she was under the continuing scrutiny of a police officer." Id. at 170. Under these circumstances, where the officers had "taken effective control of the situation, and neither they nor any other persons here [were] threatened by the possibility that [appellant] would retrieve the gun and either use it or dispose of it," the court found that the police lacked exigent circumstances justifying their warrantless search of the appellant's room. Id.
This case stands in stark contrast to the situations the police confronted in Evans and Washington . Unlike Evans , this case did not involve a situation where the participants in an alleged domestic violence dispute were already outside the apartment and being interviewed by the police. Rather, in this case the police heard yelling and screaming coming from the apartment they subsequently entered, including the sounds of a woman yelling as if she were in pain. And unlike Washington , the police in this case were not confronted with a situation where a woman was sitting peacefully on her bed with her three-year-old child when they entered the room and conducted a warrantless search. To the contrary, the woman who answered the door in this case looked panicked and concerned, did not answer the door until one to three minutes after the officers knocked on the door and announced their presence, and did not answer the officer's questions about what was happening inside the apartment. Thus, Evans and Washington present very different circumstances from this case and do not demonstrate that the police acted in an objectively unreasonable manner when they entered appellant's apartment without a warrant.
Appellant also argues that this court and the Supreme Court have upheld warrantless searches under the emergency aid exception only when there were stronger grounds to believe that emergency aid was needed. This argument has some force. Indeed, in Booth , supra , this court upheld a warrantless entry into the front hall of a rooming house where the person who answered the door had dried blood on his face and the person did not respond to the officer's questions about where the blood came from, 455 A.2d at 1356, and in Earle v. United States , 612 A.2d 1258, 1263-64 (D.C. 1992), we upheld a warrantless entry into a house where the police received a call for shots fired in or at the rear of the house, the officer waited for "quite some time" for someone to answer the door, and when someone finally answered the door, he behaved nervously, looked repeatedly back behind the door, refused to show his hands, and then tried to shut the door on the officer. Likewise, in Brigham City , supra , the Supreme Court upheld a warrantless entry where the police observed a fight occurring inside a house in which one of the occupants hit another in the face, sending the injured person to the sink, spitting blood. 547 U.S. at 406, 126 S.Ct. 1943. Finally, in Fisher , supra , the Supreme Court upheld a warrantless entry where the officers saw blood on the hood of a truck outside a house, on clothes inside the truck, and on one of the doors to the house, and then observed an occupant inside the house, with a cut on his hand, screaming and throwing things. 558 U.S. at 45-46, 130 S.Ct. 546.
While each of these cases has indicia of exigent circumstances not present in this case, such as the observation of blood on an occupant or the observation of physical injuries being inflicted inside the dwelling, none of these cases either explicitly or implicitly required the observation of such injuries before the police can enter a dwelling pursuant to the emergency aid exception. To the contrary, such a requirement is inconsistent with the Supreme Court's admonition that "the role of a *28 peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties." Id. at 49, 130 S.Ct. 546 (emphasis added). This requirement also is inconsistent with our own case law, in which we have upheld a warrantless entry under the emergency aid exception, without any evidence that the police had observed blood or physical injuries before entering the dwelling. See Oliver , 656 A.2d at 1167 (in kidnapping case, upholding warrantless entry without any evidence of "blood at the scene, gunshots, or cries for help").
Furthermore, numerous courts from other jurisdictions have found exigent circumstances in comparable situations where the police have received a report for yelling or screaming coming from a residence, and have not observed injuries to any of the occupants inside the dwelling prior to entry. See, e.g., Commonwealth v. Davido , 630 Pa. 217, 106 A.3d 611, 616-17 (2014) (upholding warrantless entry where officers received 911 call for a "domestic situation" that involved a "man hitting a woman" and were informed en route to the residence that loud screaming had been heard from inside residence); Jenkins , 329 F.3d at 580 (upholding warrantless entry where police received 911 call for assault in progress and heard noise that sounded like a person standing up and falling down as they approached the front door); State v. Sharp , 193 Ariz. 414, 973 P.2d 1171, 1175 (1999) (en banc) (upholding warrantless entry where person heard two screams coming from room on second floor, along with pounding footsteps, and no one answered door when police knocked and announced their presence); United States v. Barone , 330 F.2d 543, 544 (2d Cir. 1964) (upholding warrantless entry where police heard "loud screams" coming from rooming house in the middle of night); see also 3 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 6.6 (a) at 608, 617 - 18 (5th ed. 2012) ("there are an infinite variety of situations in which entry for the purpose of rendering aid is reasonable," including situations where police "respond to what appears to be a fight within" the premises, and to "screams in the dead of night").
Appellant and the dissent argue that the police could have and should have obtained a warrant before entering appellant's apartment. However, in making this argument, appellant and the dissent conflate the justifications underlying the emergency aid exception with the rationales underlying the other exigent circumstance exceptions. More specifically, while the police need to reasonably believe that a crime has been committed before they can make a warrantless entry to prevent the imminent destruction of evidence, Brigham City , 547 U.S. at 403, 126 S.Ct. 1943, or engage in "hot pursuit" of a fleeing suspect, id. ; see also Washington , 585 A.2d at 169, there is no such requirement when the police instead are attempting to provide emergency aid to the occupant of a dwelling. Booth , 455 A.2d at 1354. Indeed, it is because the emergency aid exception is tied to the need to address an ongoing emergency regardless of whether that emergency is the result of a crime, that we and other courts have noted that the police may enter a premises without a warrant if there is reason to believe that an occupant of the premises needs emergency assistance even if "no crime ... has been committed." Id. ; see also Oliver , 656 A.2d at 1165 ("Warrantless entry in an 'emergency' requiring preventive action may be permitted by the [emergency aid] exception if a person inside the premises is reasonably believed to be in danger even though no crime has necessarily been committed"); Sutterfield , 751 F.3d at 560 (emergency aid exception's defining characteristic is "urgency," not the existence of criminal conduct, and there is "no logical need to additionally *29 consider probable cause and the availability of a standard criminal warrant" when considering the emergency aid exception); People v. Hebert , 46 P.3d 473, 479 (Colo. 2002) (emergency aid exception does "not require probable cause that contraband or other evidence of criminal activity is located at a particular place").
Finally, the dissent argues the fact that police heard women yelling in appellant's apartment did not justify their warrantless entry into the apartment, stating that "[p]eople make noises in their homes, including yelling; sometimes they yell very loudly." Post at 32. But, of course, in evaluating the reasonableness of the police's actions, context is everything-if the police heard the occupants of appellant's apartment yelling in joy on a Sunday afternoon after the Redskins scored a touchdown, they assuredly would not have an objectively reasonable basis to enter the apartment without a warrant. But in this case, where Officer Kniseley heard a woman inside the apartment yelling not in joy, but as if she were in pain or struggling, where he heard this yelling occur at 5 in the morning, after receiving a call for an assault in progress, where an occupant in the building directed the police to the apartment and confirmed that he had called 911 because he heard yelling and screaming coming from the apartment, and where the woman who answered the door looked panicked and concerned-in that context, the reasonableness of the police actions looks quite different.[7]
Ultimately, as this court stated in Oliver , probable cause determinations in the emergency aid context do not emanate "from an antiseptic courtroom [or] a sterile library"; rather, they require a "pragmatic analysis of 'every day life on which reasonable and prudent men [and women], not legal technicians act." 656 A.2d at 1165-66 (internal quotation marks omitted). And with this framework in mind, we hold that the police lawfully entered appellant's apartment without a warrant because they had an objectively reasonable belief that they needed to enter the apartment to provide emergency assistance to an injured occupant or to protect an occupant from imminent injury.
III.
For the reasons set forth above, the judgment of the trial court is affirmed.
So ordered.

See, e.g., Wade v. United States , 173 A.3d 87, 90 (D.C. 2017).

The apartment building is a two story building, with two apartments on the first floor (Apartments 1 and 2) and two apartments on the second floor (Apartments 3 and 4).

The record is not entirely clear as to appellant's location when the officers first observed him. Officer Kniseley testified that appellant was standing in the hallway behind the corner of a wall, and "repeatedly peeking out and retreating back and forth behind that corner," while Officer Davis testified that appellant was standing in the kitchen area "shielded by a wall" and that he could only see appellant's head and his right arm. The record also is not clear whether the officers observed appellant before they entered the apartment. Officer Davis testified that he saw appellant about ten seconds after he entered the apartment, while Officer Kniseley testified that he saw appellant before he entered the apartment, even though he testified that Officer Davis entered the apartment first. The trial court did not address this conflict in the testimony and we need not address this conflict either, and instead will assume, arguendo , that the police did not see appellant until after they entered the apartment.

The trial judge did not address the government's alternative argument that the woman who answered the apartment door had consented to a search of the apartment.

Appellant does not argue that the police could not properly seize his gun once they observed it lying on the floor behind the couch in his living room; appellant only challenges the warrantless entry into his apartment.

Courts have recognized three related doctrines pursuant to which the police have been authorized to enter dwellings without a warrant: the "exigent circumstances" doctrine, the "emergency aid" doctrine, and the "community caretaker" doctrine, and the differences among these doctrines have not always been clear. See, e.g., State v. Deneui , 775 N.W.2d 221 (S.D. 2009). We consider the emergency aid exception to fit within the broader category of exigent circumstances justifying entry into a dwelling without a warrant. See United States v. Booth , 455 A.2d 1351, 1354 (D.C. 1983) (noting with approval that several courts have extended the exigent circumstances doctrine to include situations where "no crime assuredly has been committed," but "a person inside the premises is reasonably believed to be in peril"); Oliver , 656 A.2d at 1165 & n.12 (emergency aid exception is subset of exigent circumstances doctrine); Sutterfield v. City of Milwaukee , 751 F.3d 542, 553 (7th Cir. 2014) (same).
In Booth , supra , this court set forth the following test to be applied when the police enter a dwelling under the emergency aid exception: (1) the police must have "probable cause, based on specific, articulable facts, to believe that immediate entry is necessary to assist someone in danger of bodily harm inside the premises"; (2) the entry must be "tailored carefully to achieve that objective"; and (3) the entry must not be "motivated primarily by the intent to arrest or search, but by an intent to investigate a genuine emergency and to render assistance." 455 A.2d at 1355-56. The court has not decided whether these requirements are still applicable in light of Brigham City , supra , where the Supreme Court did not use the probable cause standard or consider the officer's subjective motivations, and instead stated that the police need an "objectively reasonable basis" for believing that emergency aid is needed, Brigham City , 547 U.S. at 406, 126 S.Ct. 1943, and that the "officer's subjective motivation is irrelevant" in these circumstances. Id. at 404, 126 S.Ct. 1943. We declined to address the potential implications of Brigham City in Evans , 122 A.3d at 881, and we likewise decline to address those implications in this case because appellant does not argue that the officers' subjective motivations were relevant in this case and because we will assume arguendo that the "objectively reasonable basis" standard is equivalent to the "probable cause" standard.
The dissent faults the court for using the "fuzzy" objectively reasonable basis standard. We believe this criticism is misplaced for two reasons. First, the objectively reasonable basis standard is the standard adopted by the Supreme Court, and we are not in a position to criticize this formulation, "fuzzy" or otherwise. Second, the dissent also ignores the language used by this court in Oliver , where we explicitly interpreted probable cause in the emergency aid context to mean "reasonable grounds to believe," because that formulation "fits well with a perceived emergency, in contrast with a basis for a prospective arrest, for which 'probable cause' is the traditional language." 656 A.2d at 1166.

The court is constrained to note that the dissent repeatedly mischaracterizes both the scope and effect of the court's opinion, stating that it reduces the Fourth Amendment to a "nullity" Post at 30, and "demand[s] very little information" of the police before they enter a dwelling under the emergency aid exception. Post at 34. With all due respect, the court's opinion neither makes the Fourth Amendment a nullity nor demands that the police possess very little information before entering a dwelling in order to render emergency aid. Rather, the Court's opinion is a narrow one, which notes the closeness of the issue presented and which sets forth in detail the factors supporting the warrantless entry in this case. Contrary to the dissent's protestations, the boundaries of the emergency aid exception have not been drastically redrawn to allow warrantless entries based on "nothing more than speculation and forward momentum." Post at 36.